**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **OTIS HARRIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 05 C 3000** |
| | ) | |
| **v.** | ) | **Magistrate Judge Morton Denlow** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

This case comes before this Court on Plaintiff's motion for summary judgment and the Defendant's motion for summary judgment. Plaintiff, Otis Harris ("Plaintiff" or "Claimant"), challenges the decision of Defendant Jo Anne Barnhart, Commissioner of Social Security ("Defendant" or "Commissioner"), claiming that her denial of Plaintiff's request for Supplemental Security Income ("SSI") should be reversed or remanded because the Administrative Law Judge ("ALJ"): (1) erroneously found that Claimant could perform light work, and (2) erred by failing to adequately explain why she found Claimant not credible regarding limitations in his lower extremities. For the reasons stated below, this Court denies Claimant's motion for summary judgment and grants the Commissioner's motion for summary judgment.

# I. BACKGROUND FACTS

## A.    PROCEDURAL HISTORY

Claimant filed an application for SSI on August 4, 2000, alleging a disability since June 15, 2000. R. 88-89, 130. The application was denied initially, R. 48-51, and again upon reconsideration. R. 54-55. On May 16, 2002, Administrative Law Judge Helen Cooper ("ALJ") held a hearing on the question of disability. R. 545-89. Claimant, who was represented by counsel, testified at the hearing. R. 547-588. Claimant, however, arrived almost an hour after the scheduled time, and the testimony could not be completed. R. 588. Therefore, Claimant appeared on August 29, 2002 for another hearing before the ALJ and the testimony was completed at that time. R. 463-544. Claimant, who was again represented by counsel, testified at the second hearing. R. 465-543. Dr. Richard Hamersman, a vocational expert, also testified. R. 530-37.

On December 11, 2002, the ALJ issued her decision, and determined that Claimant was not disabled and was, therefore, not entitled to benefits. R.9-31. On March 17, 2003, the Appeals Council denied Claimant's request for review. R. 5-7.

Claimant now seeks judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). The parties have consented to this Court's jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c)(1). The Court conducted an oral argument on January 11, 2006.

## B.    HEARING TESTIMONY - MAY 16, 2002

### 1. Claimant's Testimony

Claimant was 48 years old at the time of the hearing. R. 554. He said he was married to Velma, but they were separated at the time. R. 554-55. He then said he was married to Thelma, but he lives with Velma, a friend. R. 557. Claimant next said that he is married to Velma and lives with her, and he did not know who Thelma was. R.559-61. He testified that he has six children. R. 556. He did not graduate from high school and does not have a GED. R. 584.

He lives in an apartment on the first floor of a building and must climb some stairs to enter his building. R. 558. He received $100 in public aid each month and about 135 food stamps. R. 562. In the last month he had worked two days picking up paper around the building for the janitor, Mr. Brown. R. 563-64. He also worked for Flying Foods for about three days mopping and sweeping. R. 565.

He testified that he worked as a package handler at UPS for about a year until April or May 2000 when he suffered a work-related injury. R. 566-70. He worked as a clean-up person at both Krispy Kreme Donuts and Lydia Nursing Home, R. 570-71, as an air cargo agent at the Air Cargo Service Center, *id.*, as a housekeeper and food server for the Food Team temp service, R. 573-74, as a dietary aide for Marriott Food Service, R. 578, and as a mover for Midway Movers. R. 579. He hurt his ankle while working for "Johnson Contracting [INAUDIBLE] Service" in 1980-85, R. 581, and he worked as a dishwasher and a cook for KFC. R. 582.

### C. HEARING TESTIMONY - AUGUST 29, 2002

### 1. Claimant's Testimony

At the second hearing, Claimant discussed his employment history and his medical history. He stated that on August 14, 2002, at the University of Illinois at Chicago ("UIC") he had surgery on his left foot to remove a bone spur. R. 466-67. He also testified that he had a torn ligament in his knee, it happened "a couple years ago," Dr. Hutchinson at UIC wanted to perform surgery to repair the ACL, he made arrangements for the surgery, but Dr. Hutchinson cancelled it because he wanted Claimant to try a knee brace. R. 467-68. He enrolled in a hepatitis C treatment study, but he had not been treated in the study yet because the study's doctors wanted to make sure his diabetes was under control and they advised him to go to the hypertension clinic for his kidneys and see a psychiatrist. R. 468-69. Claimant said he saw a psychiatrist and was prescribed Trazodone. R. 471.

The ALJ addressed Claimant and voiced her concerns about his honesty and candor at the first hearing. The ALJ told Claimant that both she and Claimant's attorney were "kind of frustrated during the hearing that it seemed like you were maybe changing your testimony during the hearing on some very basic kinds of things. You were kind of not giving us a consistent story." R. 474. Claimant replied, "A long time ago I got hit on the head, and sometimes I forget. You know, sometimes I forget, you know, I forget where I put anything, I put my keys or I may forget a large thing sometimes." *Id.* The ALJ then went back over some of the basic information that Claimant offered at the first hearing. He said he lives at a new address with his wife, Thelma, and his sons, Elijah and Daniel. R. 476.

He stated that he had performed no work since the last hearing. *Id.* Regarding his work history, he testified that his past employment included a maintenance position in 2000 at a warehouse at O'Hare Airport for Gateway Cargo Service, a maintenance job in 2000 at

Krispy Kreme that he worked at until he injured his knee and back by lifting heavy garbage containers, a package loader at UPS in 1999 and 2000, a customer service or usher position at the [United] Center, a cook at Kentucky Fried Chicken in 1990, a cleaning position with Service Management in 1991 and 1992, and tuckpointer jobs in 1980 or 1981 and 1994. R. 477-90.

Claimant testified about his history of drug and alcohol use. R. 493-98, 516-19. He claimed that he has not consumed alcohol or used drugs since 2000 and he quit smoking about a month before the hearing. R. 498. Claimant then discussed his medical history and medical conditions, but did not refer to the problems with his lower extremities. R. 500-06.

Claimant discussed his daily life. He said he had been resting since the surgery and his sons did a lot of the chores around the house. R. 507. Claimant stated that it hurt to bend his knee, he could not do any lifting "like carry something heavy down the steps," and he could not bend over and pick up something heavy. *Id.* This stoppage in household chores took place two years before the hearing when Claimant hurt his knee. R. 508. He does none of the following activities and his wife or kids do them in his stead: go to the grocery store, cook, wash dishes, put away dishes, fold laundry, or take out garbage. R. 508-09. He just watches television all day and his wife wants him to relax and take it easy. R. 509. He said he could not stand on his feet for 10 or twenty minutes because of his lower extremity problems, but he used to be able to stand for 7-8 hours. R. 510. He could sit for maybe an hour, but he did not think he could sit for more than hour because his spine bothers him. R. 511. He said he could not bend over and pick up a $5 bill on the floor. R. 512. He took a

5

bus to the hearing, he went to church every Sunday for four hours and sat, stood, or walked around during the service, and he sometimes volunteered as an usher at church and sat and welcomed people. R. 512-14. He did not think he could stand or sit any longer. R. 516.

Claimant testified that he stopped walking for exercise because of his knee. R. 522. His knee surgery was rescheduled for October. R. 523. He was attending AA meetings at his church "as much as possible" and the meetings are from 4:00 p.m. until 10:00 p.m. on Mondays, Thursdays, Fridays, and Sundays. R. 525. When asked what things he does for his kids, Claimant replied, "We sit down and read the Bible. My kids enjoy playing Nintendo games. They like bike riding. They like fishing and things like that. They enjoy cooking." R. 526. Claimant reads with them and plays a game with them sometimes. Finally, Claimant testified about his mental health and his psychiatrist meetings. R. 527-30.

### 2. Dr. Richard Hamersman - Vocational Expert ("VE")

Dr. Richard Hamersman, a VE, also testified at the second hearing regarding existing jobs in the economy which might be suitable for Claimant. R. 530-37. Regarding Claimant's past relevant work, the VE stated that Claimant has "very little relevant work in terms of six months or longer." R. 532. However, he has had the following positions: (1) maintenance worker at Gateway, which was medium and unskilled; (2) maintenance worker at Krispy Kreme, which was heavy and unskilled; (3) a job at O'Hare Airport, which was medium and unskilled; (4) United Center customer service, which was light and unskilled; (5) tuck pointer, which was medium and semi-skilled; (6) housekeeper at Service Management, which was medium and unskilled; (7) maintenance worker at Navy Pier, which was medium and

unskilled; (8) a cook at Kentucky Fried Chicken, which was medium and unskilled; and (9) various, short-term jobs from 1994 to 1999 that were unskilled. R. 532-33.

The VE was asked to consider a person of Plaintiff's age, education, and past relevant work experience who had the residual functional capacity to perform the full range of light work with the following limitations: he should not perform constant repetitive pushing or pulling of foot or leg controls with either lower extremity against weights in excess of the light level; never climb ladders or scaffolds; avoid exposure to extremes of temperature, respiratory irritants, unprotected heights, and unguarded hazardous equipment; occasionally climb ramps and stairs; and occasionally balance, stoop, crouch, and crawl. R. 533-34. The VE responded that of Claimant's past work, he could only perform the customer service job at the United Center, R. 534, but there were approximately 20,000 cashier positions, 8,000 assembly jobs, and 7,000 hand packager positions in the Chicago metropolitan area. *Id.* Furthermore, when asked if the hypothetical person with the same limitations was limited to work at the sedentary level, the VE replied that there are approximately 5,000 cashier positions, 2,000 inspection jobs, and 9,000 assembly positions. *Id.*

## D.     MEDICAL EVIDENCE - PHYSICAL HEALTH

The arguments that Claimant presents in his motion for summary judgment stem solely from his lower extremity impairments. Therefore, this Court will only discuss the medical evidence that relates to Claimant's lower extremities. The ALJ's decision contains a comprehensive discussion of all of the medical evidence.

### 1.     Cook County Hospital - March 2, 1999

Claimant was treated in the emergency room at Cook County Hospital on March 2, 1999, and pain on his right knee was one of his listed triage problems.  R. 168.

### 2.     Dr. Fauzia A. Rana - Consulting Physician - January 3, 2000

Dr. Fauzia A. Rana performed a consultative medical examination for SSA on January 3, 2000.  R. 198-201.  Dr. Rana noted that Claimant's history of present complaints included joint pain complaints of aching pain in his lower back and both knees.  R. 198.  Claimant denied any joint swelling, but said he could not walk any distance because of the pain in his knees.  R. 199.  He had no redness, swelling, or deformities of any joint.  R. 200.  However, a proper range of motion could not be done because he was not cooperative.  *Id.*  Claimant complained of pain on all movements.  *Id.*  Dr. Rana reported that there was possible degenerative arthritis, but there was no significant limitation of movement because of pain at that time.  *Id.*  Dr. Rana also reported that Claimant was not cooperative during the physical examination.  R. 199.

### 3.     Dr. Henry S. Bernet - Physical Residual Functional Capacity Assessment - February 7, 2000

On February 7, 2000, Dr. Henry S. Bernet, a state agency physician, reviewed Claimant's record evidence and opined that Claimant had the following limitations: he could occasionally lift and/or carry up to 50 pounds; frequently lift and/or carry up to 25 pounds; stand and/or walk (with normal breaks) for about 6 hours in an 8-hour work day; sit (with normal breaks) for about 6 hours in an 8-hour work day; ability to push and/or pull was limited in the lower extremities; no climbing of ladders, ropes, or scaffolds; and he should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and hazards such as machinery or heights. R. 181-88. Dr. Bernet did not report any other limitations.

### 4.     Dr. Peter Biale - Consulting Physician - August 23, 2000

Dr. Peter Biale examined Claimant on August 23, 2000. R. 218-22. Claimant's chief complaints included: (1) bronchial asthma; (2) hepatitis C; (3) seizure disorder; and (4) chest pain. R. 218. Dr. Biale reported that there was no apparent hesitation with Claimant when he moved about. R. 219. Dr. Biale also noted that when Claimant moved from a sitting to a supine position and back up again, there was no difficulty. *Id.* Claimant's range of motion was full in all of his joints of the upper as well as the lower extremities. R. 221. Finally, Claimant's peripheral pulses of the upper and lower extremities were 2+ and equal bilaterally. R. 220.

**5.      Dr. Kim - Physical Residual Functional Capacity Assessment - September 28, 2000**

On September 28, 2000, Dr. Kim, a state agency physician, reviewed Claimant's record evidence and opined that Claimant had the following limitations: he could occasionally lift and/or carry up to 20 pounds; frequently lift and/or carry up to 10 pounds; and stand and/or walk (with normal breaks) for about 6 hours in an 8-hour workday; he could sit (with normal breaks) for about 6 hours in an 8-hour workday; and he should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation.  R. 261-65.  Dr. Kim did not report any other limitations.  Dr. Bernet agreed with Dr. Kim's assessment.  R. 268.

**6.      Dr. Robert England - Physical Residual Functional Capacity Assessment - December, 26, 2000**

On December, 26, 2000, Dr. Robert England, a state agency physician, reviewed Claimant's record evidence and opined that Claimant had the following limitations: he could occasionally lift and/or carry up to 20 pounds; frequently lift and/or carry up to 10 pounds; and stand and/or walk (with normal breaks) for about 6 hours in an 8-hour workday; he could sit (with normal breaks) for about 6 hours in an 8-hour workday; and he should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. R. 295-301.  Dr. England did not report any other limitations.  Dr. England did note, however, that "[C]laimant is capable of SGA at the light exertional level."  R. 302.

**7.      The University of Chicago Hospitals - January 9, 2001**

On January 9, 2001, Claimant presented himself to the emergency room at the University of Chicago Hospital with right knee pain. R. 303. He was started on Ibuprofen therapy at that time, but he continued to have severe right knee pain the next day. *Id.* He reported that the pain was most severe with weight bearing, but it did hurt when he bent his knees. *Id.*

### 8.    Dr. Rita Nanda - The University of Chicago Hospitals - January, 10, 2001

Dr. Rita Nanda examined Claimant on January 10, 2001, and found that Claimant was in no apparent distress. R. 304. However, his right knee was tender to palpation over the medial aspect, with decreased range of motion secondary to pain, and positive crepitus[1]. *Id.* Dr. Nanda opined that Claimant's knee pain was most likely secondary to osteoarthritis versus to strain of his medial meniscus or medial collateral ligament. Dr. Nanda prescribed Ibuprofen and recommended light duty at work for a week. R. 305.

### 9.    University of Illinois at Chicago Medical Center - December 2001 - August 2002

On December 19, 2001, Claimant presented to the University of Illinois at Chicago Medical Center (UIC) with complaints of right knee pain of two years duration and left ankle pain of many years duration. R. 326. An examination revealed positive tenderness over the medial joint line as well as the posterolateral joint line. *Id.* There was a positive Lachman's

---

[1] The grating of a joint. *Stedman's Medical Dictionary* 409 (26th ed. 1995).

test[2] and a negative posterior drawer test[3]. *Id.* There was no swelling. *Id.* For the left ankle, there was a medial scar from previous surgery and it was mildly tender over the medial talotibial joint. *Id.* X-rays of the right knee exhibited no fracture or dislocation, but possibly showed a healed, old fracture of the proximal right fibula. R. 327. X-ray of the left ankle showed a pin and screw in the medial malleolus and healed fracture of the lateral malleolus. *Id.* There were also mild osteoarthritic changes over the medial joint line. *Id.* The doctor assessed Claimant as a patient with right knee pain and possible ACL rupture and left ankle pain mostly from osteoarthritis. *Id.*

An MRI was taken of Claimant's right knee on January 11, 2002. R. 310-11. The findings showed an old ACL injury, an extensive bucket-handle tear involving 50%-75% of the meniscal substance with anterior and intercondylar displacement of the fragment, an incomplete radial tear through the body segment of the lateral meniscus, a grade 2 LCL injury, a grade 3 chondromalacia[4] (grade 3) of the patellofemoral compartment, a small joint effusion, and a Baker's cyst[5]. R. 311.

---

[2] A maneuver to detect deficiency of the anterior cruciate ligament; with the knee flexed 20 to 30 degrees, the tibia is displaced anteriorly relative to the femur; a soft endpoint or greater than 4 millimeters of dis placement is positive (abnormal). *Stedman's Medical Dictionary* 1780 (26th ed. 1995).

[3] In a knee examination, the forward or backward sliding of the tibia indicating laxity or tear of the anterior (forward sliding) or posterior (backward slide) cruciate ligaments of the knee. *Stedman's Medical Dictionary* 1616 (26th ed. 1995).

[4] The softening of any cartilage. *Stedman's Medical Dictionary* 332 (26th ed. 1995).

[5] A collection of synovial fluid which has escaped from the knee joint or a bursa and formed a new synovial-lined sac in the popliteal space. It is seen in degenerative or other joint diseases. *Stedman's Medical Dictionary* 430 (26th ed. 1995).

On January 17, 2002, Dr. Mark Hutchinson recommended a right knee diagnostic arthroscopy with meniscectomy[6] and discussed ACL reconstruction with Claimant. R. 324. Claimant opted only for the meniscectomy and it was scheduled for February 26, 2002. *Id.*

X-rays taken of Claimant's feet on July 24, 2002 showed prominent bone spurs on both feet. R. 379. Therefore, Claimant underwent corrective left foot surgery on August 15, 2002. R. 395. Claimant tolerated the procedure well, was prescribed medications, was given a post-op shoe, and told to return for a follow-up in the clinic in one week. *Id.*

**E.    THE ALJ'S DECISION - DECEMBER 11, 2002**

After conducting the hearings and reviewing the evidence, the ALJ prepared a comprehensive decision and found that Claimant was not disabled within the meaning of the Social Security Act. R. 9-31. Although she determined that Claimant had severe impairments, and that he could not perform any past relevant work, the ALJ found that Claimant had the residual functional capacity to perform a wide range of unskilled light and sedentary work. R. 30-31.

The ALJ assessed Claimant's application for SSI under the five-step sequential analysis. *See infra*, Part II B (describing the disability standard of review). Under step one of the disability analysis, the ALJ found that Claimant did not engage in any substantial gainful activity since her alleged onset date. R. 15, 30.

Under the second step, the ALJ determined that Claimant's asthma, hypertension,

---

[6] The excision of a meniscus, usually from the knee joint. *Stedman's Medical Dictionary* 1088 (26th ed. 1995).

non-insulin dependent diabetes melligus (DM), hepatitis C, and musculoskeletal problems affecting his ankle, knee, and foot were severe impairments. R. 15, 30. At step three, however, the ALJ found that Claimant's severe impairments did not meet or equal a listed impairment under the Social Security regulations. R. 16, 30.

At step four, the ALJ determined Claimant's residual functional capacity to see if he was precluded from returning to his past relevant work. The ALJ first noted that Claimant has had little documented routine medical care for his chronic impairments, but he instead has gotten much of his care in various hospital ERs or in brief courses of treatment in outpatient clinics or facilities. R. 17. The ALJ then set forth Claimant's extensive, and fragmented, medical record. R. 17-23. Next, the ALJ discussed the opinions of the numerous doctors that reviewed Claimant's record at the request of the state Disability Determination Service and the physical or mental RFC opinion forms such doctors prepared after their reviews. R. 23-24. The ALJ then considered Claimant's reported symptoms, daily activities, and credibility. R. 24-27. The ALJ stated that she could "[o]verall ... give very little credit to [C]laimant's testimony and other reports." R. 26. Finally, the ALJ concluded that "with the exception of the brief recovery period after the foot surgery, [C]laimant has had the physical RFC to perform and sustain most light work throughout the relevant period." R. 27. The ALJ then listed some findings and limitations,[7] and found "further that, since he

---

[7] "He can lift, carry, push and pull up to 20 pounds occasionally and up to 10 pounds frequently and he can sit, stand, and/or walk throughout an ordinary work day, with normal breaks. He should not perform constant repetitive motions with either lower extremity, and should not climb ladders, ropes or scaffolds. He can occasionally climb

has reduced his drinking and discontinued using street drugs, [C]laimant has the mental RFC to perform and sustain unskilled work." R. 27. After discussing Claimant's past relevant work, the ALJ found "that [C]laimant lacks the physical RFC to perform his past relevant work." R. 29.

Under step five, the ALJ determined that Claimant was capable of performing a significant range of light work. R. 29. The ALJ discussed the VE's testimony and set forth the occupations Claimant could perform, which included 20,000 cashier positions, 8,000 assembler jobs, and 7,000 hand packer positions. R. 30. Furthermore, the ALJ stated that if a claimant could perform light work, she could "determine that he can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods." R. 29. Therefore, the ALJ concluded that Claimant is not disabled. R. 30.

## II. LEGAL STANDARDS

### A. STANDARD OF REVIEW

The "findings of the Commissioner of Social Security as to any fact, if supported by

---

ramps and stairs, balance, stoop, kneel, crouch, and crawl. He should not be exposed to extremes of temperature, concentrated respiratory irritants, unprotected heights or unguarded hazardous equipment. Claimant's occasional pain, depression and other symptoms, in combination, would distract him, such that he was only seldom off-task and non-productive (less than 5% of an ordinary work day), outside normal breaks." R. 27.

substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A decision by an administrative law judge, ("ALJ"), becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Wolfe v. Shalala,* 997 F.2d 321, 322 (7th Cir. 1993)**.** Under such circumstances, the decision reviewed by the district court is the decision of the ALJ. *Eads v. Sec'y of the Dep't of Health & Human Servs.*, 983 F.2d 815, 816 (7th Cir. 1993). Judicial review is limited to determining whether the ALJ applied the correct legal standards in reaching his decision and whether there is substantial evidence in the record to support the findings. *Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). A mere scintilla of evidence is not enough. *Diaz v. Chater,* 55 F.3d 300, 306 (7th Cir. 1995). Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if "the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996). If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

While a reviewing court must conduct a "critical review" of the evidence before affirming the Commissioner's decision, *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000), it may not re-evaluate the facts, re-weigh the evidence, or substitute its own judgment for that of the Social Security Administration. *Diaz,* 55 F.3d at 305-06. Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards in reaching a decision and whether there is substantial evidence to support the findings. *Scively v. Sullivan,* 966 F.2d 1070, 1075 (7th Cir. 1991)**.** The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## B.    DISABILITY STANDARD

Disability insurance benefits, ("DIB"), are available to claimants who can establish "disability" under the terms of Title II of the Social Security Act, ("Title II"). *Brewer v. Charter*, 103 F.3d 1384, 1390 (7th Cir. 1997). Supplemental Security Income benefits, ("SSI"), are available to "disabled indigent persons" under Title XVI of the Social Security Act, ("Title XVI"). *Barnhart v. Thomas,* 540 U.S. 20, 24 (2003). Titles II and XVI of the Social Security Act employ the same definition of "disability." *Id.* That is, an individual is disabled if that individual has the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). However, a disabled individual is eligible for DIB and SSI only if that individual is under a disability. 42 U.S.C. §§ 423(a); 1382c(a). An individual is under a

disability if he is unable to do his previous work and cannot, considering his age, education, and work experience, partake in any gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B).

To make this determination, the Commissioner must employ a five step sequential analysis. 20 C.F.R. §§ 404.1520(a)-(f); 416.920(a)-(f). If the ALJ finds at any step of this process that a claimant is not disabled, the inquiry ends. *Ismahel v. Barnhart,* 212 F. Supp. 2d 865, 872 (N.D. Ill. 2002). The process is sequential; if the ALJ finds that the claimant is not disabled at any step in the process, the analysis ends. Under this process, the ALJ must inquire: (1) whether the claimant is still working; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) if the claimant does not suffer from a listed impairment, whether he can perform past relevant work; and (5) whether the claimant is capable of performing any work in the national economy. *Id.*

## III. DISCUSSION

Claimant raises two issues for review: (1) whether the ALJ erroneously found that Claimant could perform light work, and (2) whether the ALJ erred by not adequately explaining why she found Claimant not credible regarding limitations in his lower extremities.

**A.     SUBSTANTIAL EVIDENCE SUPPORTS THE ALJ'S FINDING THAT CLAIMANT COULD PERFORM LIGHT AND SEDENTARY WORK**

Claimant argues that the ALJ did not address Claimant's ability to perform the functional demands of light work despite the problems in his lower extremities, nor did she explain how she concluded that a person with Claimant's impairments in his lower extremities could perform the extensive standing/walking required for light work. Specifically, Claimant argues that an MRI objectively demonstrated serious impairments in his right knee. In addition, he asserts that "he had residual osteoarthritis in the ankle and, despite surgery on the left foot prior to the hearing, bone spurs in the right foot." Pl. Mot. 13. He claims that those problems, particularly those in the right knee, would reasonably be expected to affect a person's ability to walk or stand for the time required to perform light work. Therefore, Claimant argues, the ALJ committed error by failing to discuss such evidence and she failed to sufficiently articulate the grounds for her decision to permit informed judicial review.

Although an ALJ need not discuss every piece of evidence in a claimant's record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995). This is necessary so that a reviewing court can tell whether the ALJ's decision rests upon substantial evidence. *Golembiewski*, 55 F.3d at 307. However, the ALJ must only minimally articulate her assessment of this line of evidence. *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004). After all, "[i]f a sketchy opinion assures us that the ALJ considered the

important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Id.*

In this case, the ALJ adequately discussed Claimant's problems with his lower extremities. In her decision, the ALJ discusses Claimant's ankle and knee issues in several instances. The ALJ found that Claimant's musculoskeletal problems affecting his ankle, knee, and foot constituted severe impairments. R. 15, 30. The ALJ noted that a doctor at the Circle Family clinic diagnosed Claimant with arthralgia of the right knee on June 13, 2000. R. 18. Next, the ALJ stated that Claimant complained of right knee pain at the University of Chicago ER and primary care clinic in January 2001, and on exam his right knee was tender and had decreased range of motion. R. 19. The ALJ noted more complaints of knee trouble by Claimant in December 2001 to Dr. Bassem Elhassan and an exam by Dr. Elhassan found that Claimant's "right knee was tender and the left ankle was mildly tender, with decreased range of ankle motion." R. 20. The ALJ then stated that Claimant had x-rays of his right knee and left ankle on the date of the exam, which showed that "the knee was thought to have a questionable mild abnormality; the ankle showed an old healed fracture." *Id.* The ALJ wrote that Dr. Elhassan ordered an MRI of the knee to evaluate whether Claimant had a ruptured ligament in the knee and Claimant was referred to Dr. Mark Hutchinson for further evaluation of the knee. *Id.*

Next, the ALJ expressly discussed Claimant's MRI. She stated that "Claimant had an MRI of his right knee on January 11, 2002, which showed the old ACL (knee ligament) injury and a 50 - 75% tear of the meniscus, along with other abnormalities." R. 21. The ALJ

then wrote that Claimant saw Dr. Hutchinson on January 17, 2002, and "Dr. Hutchinson noted the abnormal MRI, and examined [C]laimant noting that [C]laimant would be scheduled for arthroscopic surgery. Claimant was not willing to have the doctor perform reconstruction of the ACL at the same time. The surgery was scheduled for February 26, 2002." *Id.*

Regarding Claimant's ankle, the ALJ also wrote that Claimant had x-rays of both feet on July 24, 2002. R. 22. The ALJ stated that the "x-rays showed bilateral spurs and calluses, and the old left ankle fracture ... Claimant had minor outpatient surgery on the fourth and fifth toes on his left foot at UIC on August 15, 2002." *Id.* The ALJ noted that Claimant was given a "post-op shoe" and was advised to return in one week for a follow-up. *Id.* Finally, the ALJ reported that Claimant was using two crutches at the time of the August 29, 2002 hearing. *Id.*

As set forth above, the ALJ addressed and discussed Claimant's problems with his right knee, feet, and ankle. Before discussing Claimant's medical records, the ALJ stated, "Claimant has had little documented routine medical care for his chronic impairments, instead getting much of his care in various hospital ERs or in brief courses of treatment in outpatient clinics or facilities. He apparently has not always followed up with advice to return for routine follow up, or with many referrals for specialist care or additional tests or procedures." R. 17. For example, following the MRI of Claimant's knee, Dr. Hutchinson recommended surgery and the surgery was scheduled for February 26, 2002. R. 21. It is not clear from Claimant's record, however, whether such surgery was ever performed.

The ALJ relied on the objective evidence and the doctors' opinions. While some medical evidence was not gathered until after both hearings, the doctors who reviewed Claimant's records were still aware of Claimant's complaints and symptoms regarding his knee, ankle, and feet. Claimant possessed his lower extremity problems when these doctors examined Claimant and/or reviewed his medical record. The record is simply devoid of any doctor opining that Claimant was disabled and unable to work. Moreover, Claimant presented the subsequent evidence to the ALJ and the ALJ carefully reviewed it and discussed it in her decision. The ALJ received different fragments of medical evidence after the hearings that showed impairments in Claimant's lower extremities, but none of that evidence showed a disabling impairment. And most importantly, none of that evidence included a doctor's opinion that Claimant was disabled and could no longer work.

Claimant had numerous impairments, which included asthma, hypertension, non-insulin dependent diabetes melligus (DM), hepatitis C, and musculoskeletal problems affecting his ankle, knee, and foot. The ALJ provided a lengthy, thorough decision[8] that properly discussed all of Claimant's medical issues and severe impairments. The ALJ adequately discussed the impairments afflicting Claimant's lower extremities and considered all the medical evidence relating to such extremities.

Furthermore, the ALJ stated that "[i]f someone can do light work, we determine that he can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods." R. 29. Therefore, the ALJ expressly found that

---

[8] Claimant even stated in his brief that aside from Claimant's arguments, the ALJ furnished a "detailed decision." Pl. Mot. 13.

"[C]laimant has the residual capacity to perform a wide range of unskilled light and sedentary work...." R. 31. Notwithstanding the ALJ's clear finding that Claimant could perform both light and sedentary work, Claimant only takes issue before this Court with the ALJ's finding that he can perform light work. Claimant presented no argument that he could not perform sedentary work. Under the five-step inquiry, however, if the ALJ finds that Claimant is capable of performing work in the national economy, then the ALJ must make a determination that Claimant is not disabled. *Clifford*, 227 F.3d at 868. Therefore, not only was the ALJ's finding that Claimant could perform light work supported by substantial evidence, the ALJ also properly found that Claimant could perform sedentary work and Claimant takes no exception with that finding. In this case, substantial evidence supports the ALJ's finding that Claimant could perform unskilled light and sedentary work, and the ALJ more than minimally articulated how she came to such a finding.

## B.  THE ALJ ADEQUATELY ARTICULATED HER REASONS FOR FINDING CLAIMANT NOT CREDIBLE

Claimant argues that the ALJ failed to articulate logical grounds for her finding that Claimant was not credible. Claimant admits that the ALJ discussed numerous factors to discredit Claimant as a whole, but Claimant asserts that the ALJ failed to address the credibility of those portions of Claimant's testimony relating to his impairments in his lower extremities.

The ALJ is afforded special deference in his credibility determinations because she is in the best position to see and hear the claimant and assess her forthrightness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Therefore, an ALJ's credibility determination will

only be reversed if the claimant can show it was "patently wrong." *Id.* Pursuant to SSR 96-7p, however, the ALJ must give specific reasons for her credibility finding and cannot merely make a conclusory statement that the claimant's allegations have been considered and they are or are not credible. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). Thus, the ALJ's credibility determination will be affirmed "as long as the ALJ gives specific reasons that are supported by the record for his finding." *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004).

In *Skarbek*, the ALJ determined that the claimant was not credible regarding his limitations. 390 F.3d at 505. The ALJ gave only two reasons for his findings.[9] *Id.* The Seventh Circuit, however, found that the ALJ complied with SSR 96-7p's requirement that he give specific reasons for his findings even he though he only provided two reasons. *Id.*

---

[9] "First, the ALJ stated that Skarbek's testimony of constant throbbing pain was not consistent with the findings of the specialists or with Skarbek's medical records. Second, the ALJ stated that Skarbek's testimony regarding his daily activities--that, among other things, he drove, did laundry and household chores, and was able to cut grass on occasion--did not support a finding that he was totally disabled. The ALJ found that Skarbek's abilities and activities were more consistent with the opinions of Dr. Yergler and Dr. Graham than with his own testimony." *Skarbek*, 390 F.3d at 505.

In the instant case, the ALJ gave several reasons and provided sufficient support for her credibility finding.   The ALJ set forth multiple instances where Claimant's assertions and testimony appear less than truthful.  First, Claimant reported on a form that "Thelma Gaines, a friend, did his cooking and cleaning, and helped him complete the forms."  R. 24. Then at the second hearing, Claimant testified that he is married to Thelma.  R. 25.  Next, the ALJ stated that Claimant's record includes "three seizure description forms, purportedly signed by [C]laimant's mother, Ruby Harris, his friend Thelma Gaines, and his 'mother-in-law,' Marie Gaines, although I note that the handwriting on the three forms appears to be quite similar."  R. 25.   The ALJ then reported that Claimant's testimony included the following discrepancies and contradictions:

> At the start of the first hearing, [C]laimant testified that he had lived in his current apartment for about five years, and that he had been separated from his wife for four years.  He testified first that he lived with his friend, Velma, and that Velma worked and paid the $600 per month rent on the apartment.  He testified that Velma works, but he was not sure where or what she does.  He testified that he has five children, including two minor sons with his wife, from whom he was separated.  He testified that he was getting general assistance and food stamps, and that Velma was handling his money for him, and occasionally bought things for him.  He later testified that he has six children, including two adults, two children with his wife, and two younger children who have different mothers.
>     A few minutes later, [C]laimant testified that Velma is his wife, and that he lives with and has been married to her, and is not separated; he testified that his wife Velma was waiting for him in the reception area during the hearing. When Mr. Grossman and I attempted again to clarify [C]laimant's circumstances, he testified that he is, and has been married to Thelma for ten years, and he pretended to have no idea to whom we were referring when we asked him about the person he previously called Velma.

R. 25.

The ALJ also noted that at both hearings, Claimant "testified that he completed only the ninth grade, and that he was unable ever to get a GED, although he attended a study class for a short period. Claimant reported on his disability report that he graduated from high school in 1972." R. 25. The ALJ noted that when she "began to ask questions about his medical problems, and particularly about his substance use history, [C]laimant began to claim significant memory problems, and to seem very evasive and unwilling to give clear answers to [her] questions." R. 26. Finally, the ALJ stated:

> Overall, I can give very little credit to [C]laimant's testimony and other reports. I note that [C]laimant has made materially inconsistent statements to his doctors, at both hearings, and in connection with the processing of these claims about many of the facts in question. His inconsistencies have related to the most basic issues (such as his marital status and living situation during the relevant time), his impairments (such as whether he has or ever had a seizure disorder), his substance history, and the effect of his impairments on his ability to function. During the year before the second hearing, it appears from the UIC records that [C]laimant was seeking treatment primarily to support his disability claim, and that, when a possible impairment appeared not to be disabling, he focused instead on another possible cause of disability, instead of following up as directed with primary or even specialty care for his chronic (but not disabling) problems.

In light of *Skarbek* and the ample support the ALJ provided, this Court finds that the ALJ observed the SSR-96-7p requirements and did not err in her credibility determination.

## IV. CONCLUSION

No doctor ever opined that Claimant was disabled or unable to work. The ALJ thoroughly addressed Claimant's record evidence and clearly articulated her reasons for finding that Claimant was not disabled. Her conclusion is supported by substantial evidence.

**For the reasons set forth in this opinion, Plaintiff's Motion for Summary Judgment is DENIED and the Commissioner's Motion for Summary Judgment is GRANTED.**

**SO ORDERED THIS 20TH DAY OF JANUARY, 2006.**

_____
**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**


**Copies mailed to:**

M. Jacqueline Walther
KIELIAN & WALTHER
33 West Jackson Boulevard, Suite 201
Chicago, IL 60604

Counsel for Plaintiff

Henry Kramzyk
Assistant Regional Counsel
SOCIAL SECURITY
ADMINISTRATION
200 West Adams Street, Suite 3000
Chicago, IL 60606

Counsel for Defendant